**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ANTHONY MERTSON and MICHAEL SCHIRANO, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

ROUTE APP, INC.,

Defendant.

Case No. 3:26-cv-1172 (ECC/ML)

**AMENDED CLASS ACTION COMPLAINT**

Honorable Elizabeth Cherly Coombe, U.S.D.J.
Honorable Miroslav Lovric, U.S.M.J.

Plaintiffs Anthony Mertson and Michael Schirano on behalf of themselves and all others similarly situated, complain and allege upon information and belief based, among other things, upon the investigation made by Plaintiffs and through their attorneys as follows:

## INTRODUCTION

1. This is a proposed class action seeking monetary damages, restitution, and public injunctive and declaratory relief from Route App, Inc. ("Route") arising from its deceptive addition of items or services to consumers' online shopping carts without affirmative action from consumers.

2. Route encourages e-commerce retailers to use a "negative option" that surreptitiously adds Route's so-called "Shipping Protection" service to orders without asking consumers.

3. Route's negative option practice deceives consumers in two related ways, both arising from the same uniform checkout design. *First*, consumers do not notice that the optional

service has been added late in the checkout process and are charged for a product they never chose to buy. *Second*, even consumers who notice the additional service has been added without their affirmative action reasonably understand that optional items or services will not be added to their shopping carts, and therefore reasonably believe that—like taxes—the added item or service is mandatory and unavoidable.

4. Either way, consumers pay for Route's optional service without ever making an informed, affirmative choice to buy it.

5. Federal regulators have long condemned this "negative option" practice, and the Federal Trade Commission has stated that **"[a] 'pre-checked box' does not constitute affirmative consent."** Federal Trade Commission Public Statement, *Enforcement Policy Statement Regarding Negative Option Marketing*, October 22, 2021, https://www.ftc.gov/system/files/documents/public_statements/1598063/negative_option_policy_statement-10-22-2021-tobureau.pdf at p. 13 (emphasis added).

6. Route chose this negative option design because it works. Route knows that if it required consumers to affirmatively choose to buy the optional service it sells, the vast majority would not purchase its product. Route also pressures retailers to keep its pre-checked default in place, and, as Route itself touts, 98% of merchants do so. Route keeps a substantial portion of every service sold.

7. Plaintiffs made purchases while Route's negative option design was in place.

8. Thousands of e-commerce customers like Plaintiffs have been assessed inconspicuous charges which they did not bargain for due to Route's deceptive tactics.

9. Plaintiffs seek damages and, among other remedies, public injunctive relief requiring that consumers be permitted to affirmatively decide whether to purchase Route's service

before they are charged for it.

**PARTIES**

10. Plaintiff Anthony Mertson is a resident and a citizen of Owego, New York.

11. Plaintiff Michael Schirano is a resident and a citizen of West Islip, New York.

12. Defendant Route App is an American software company for e-commerce retailers headquartered in Lehi, Utah.

**JURISDICTION AND VENUE**

13. This Court has original jurisdiction of this action, among other reasons, under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class is comprised of at least 100 members; (2) at least one member of the proposed class resides outside of New York; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Route is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

**I. Route Designs and Controls a Widget That Automatically Charges Consumers**

15. Route offers various services to e-commerce retailers related to shipping including its purported "Shipping Protection" service.

16. Route markets its package protection to e-commerce retailers as a way to "[p]rotect [their] reputation and bottom line."




17. But Route helps e-commerce retailers protect their "bottom line" through deception. As described herein, Route directs e-commerce retailers who use its services to install a widget on their websites. That widget adds an inconspicuous, *pre-selected* box or toggle that automatically adds "Shipping Protection" or "Package Protection" fees to all orders. This method of adding on fees is designed to be undetected by consumers and to provide additional revenue to both Route and e-commerce retailers who use it.

18. On information and belief, Route designs the interface presented by merchants to consumers regarding the automatic addition of the optional shipping protection service, including time at which the service is first added to shopping carts without consumer action, the time at which the service amount is added to the purchase price, and the pre-selection of the box or toggle for the service.

19. Route designed the default to automatically include its service on all orders on a given merchant's website, and encourages merchants to keep its default option in order to pad

Route's profits. This strategy works. As Route touts, 98% of merchants leave the pre-checked box pre-checked:







*See Can the Box Switch So It's Automatically Unchecked?*, Route Merchant Help Ctr., https://merchants.help.route.com/hc/en-us/articles/360020897294-Can-the-box-switch-so-it-s-automatically-unchecked (last visited Oct. 22, 2026). That is because Route "highly recommend[s]" to its customers that they leave the box auto-checked to increase its own sales to unsuspecting consumers. On information and belief, Route uses sales tactics that pressure merchants into keeping the box auto-checked.

20. Route's own figures confirm that its default, not consumer choice, drives its sales. On the same page, Route tells merchants that, "[o]n average, merchants who have their box unchecked only (opt-in) have 8% of their store covered." *Id.* In other words, when consumers must affirmatively choose Route's service, roughly nine in ten decline it.

21. That a merchant could, in theory, change Route's default does not diminish Route's responsibility for it. Route designed the default, installed it, recommended it, pressured merchants to retain it, and Route profits from every charge the default generates. The near-universal retention of Route's default—98% by Route's own account—confirms that the default presented to consumers is Route's design, not an independent merchant choice. Route's liability for its own conduct is not displaced by the merchant's participation.

22. The Wall Street Journal highlights the problem, stating:

> Some brands automatically add optional coverage to orders. ***Customers have complained the fees are disclosed in small fonts, made to appear mandatory when they are not or are displayed late in the online checkout process***.

Imani Moise, *Porch Pirates Are Now Raising the Price You Pay at Checkout*, Wall Street Journal, December 25, 2024, available at https://www.wsj.com/personal-finance/package-theft-hidden-fee-higher-prices-325c4a34?mod=Searchresults_pos3&page=1 (emphasis added).

23. Upon information and belief, Route is aware that by programming its widget to automatically opt in consumers to its "Shipping Protection" or "Package Protection" services, most consumers will unknowingly purchase the service. Route is further aware that had it programmed its widget to offer *optional* Shipping Protection (requiring an opt-in), the vast majority of consumers would not purchase its product.

24. Route receives a significant portion—upon information and belief, approximately half—of all fees it can foist upon consumers, and is thereby incentivized to minimize the number of persons who opt out of the fee.

25. Shopify, whose platform hosts many retailers that use Route, changed its app requirements effective February 18, 2025. Apps must now clearly display costs and obtain explicit buyer consent before adding an optional paid item to an order:

> To qualify for the Shopify App Store, your app must meet the requirements listed below. . .
>
> **1.1.9 Obtain explicit buyer consent before adding charges.** Apps can't automatically add or pre-select optional charges to a buyer's cart that increase the total checkout price. Apps can only add optional charges to carts or at checkout after displaying the additional cost in a manner that is clear to the buyer, and upon obtaining explicit buyer consent.
>
> . . .
>
> **5.6.5 Get explicit customer consent prior to making any changes that affect the order total in any way**. Apps can't automatically add or pre-select optional charges to a buyer's cart that increase the total checkout price. Apps can only add optional charges to carts or at checkout after displaying the additional cost in a manner that is clear to the buyer, and upon obtaining explicit buyer consent.

*App Store Requirements*, Shopify Dev. Docs., https://shopify.dev/docs/apps/launch/shopify-app-store/app-store-requirements (emphasis in original, last visited Oct. 21, 2026).

26. This change came too late to help the thousands of consumers already deceived and exploited like Plaintiffs were.

## II. Route's Negative Option Widget is Deceptive and Unfair to Consumers

27. Here's how Route's deception works. Across all online shopping sites, consumers' shopping carts begin as 100% empty.

28. Reasonable consumers understand their shopping carts will remain empty until a consumer, seeing an item and a corresponding price listed on the website, affirmatively chooses to add an item or service to their shopping cart. In other words, reasonable consumers understand merchants will not put optional items or services into their shopping carts—just as, for example, a brick-and-mortar supermarket will not slip a few packs of gum or an extra apple or two into shopping carts being wheeled around the store.

29. Once finished shopping, normal, non-deceptive internet commerce proceeds through a checkout process wherein other *mandatory* charges like taxes and shipping charges are

added without affirmative consumer action to an order total, then presented to consumers in an itemized fashion prior to checkout.

30. A shopping cart and order summary are communications to the consumer. They tell the consumer what the consumer chose to buy and what the consumer must pay to complete the purchase. Every consumer who completes a purchase views the order summary and order total and relies on them in clicking to pay.

31. On information and belief, Route's widget, not the merchant, inserts Route's product into the order and causes the order total to include Route's charge. When it does, the order summary and total represent that the order contains only what the consumer selected, plus required charges. For every consumer charged through Route's default, that representation is false.

32. In short, normal online shopping—like normal brick and mortar shopping—is based on a simple premise: only consumers can add optional items or services to their shopping carts, and optional items or services can only be added to shopping carts with affirmative consumer action.

33. Route's negative option widget flips the normal internet shopping process on its head, adding optional items or services to a consumer's shopping cart automatically, without any consumer action.

34. Once the consumer begins the checkout process of the e-commerce retailer's website, Route's widget adds the optional "Shipping Protection" or "Package Protection" service to the cart late during the purchase process, *without the consumer having done anything at all to have added the item to the cart*.

35. As the FTC notes, "For years, unscrupulous direct-mail and brick-and-mortar retailers have used design tricks and psychological tactics such as pre-checked boxes, hard-to-find-

and read disclosures, and confusing cancellation policies, to get consumers to give up their money or data." Press Release, Fed. Trade Comm'n, *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers* (Sept. 15, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers.

36. The FTC further notes in its *Enforcement Policy Statement Regarding Negative Option Marketing* that **"[a] 'pre-checked box' does not constitute affirmative consent."** Federal Trade Commission Public Statement, *Enforcement Policy Statement Regarding Negative Option Marketing*, October 22, 2021, https://www.ftc.gov/system/files/documents/public_statements/1598063/negative_option_policy_statement-10-22-2021-tobureau.pdf at p. 13 (emphasis added). Similarly, an item automatically added to the cart, without having done anything whatsoever to add that item, does not constitute affirmative consent.

37. Congress has likewise condemned negative option sales. In the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401–8405, Congress found that "'negative option'" sales "took advantage of consumers' expectations," *id.* § 8401(8), and prohibited charging consumers through a negative option feature in internet transactions unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, and (2) obtains the consumer's express informed consent before charging the consumer. *Id.* § 8403(1), (2). Route's widget is a negative option feature—a provision under which "the customer's silence or failure to take an affirmative action to reject goods or services . . . is interpreted by the seller as acceptance of the offer," 16 C.F.R. § 310.2 (definition incorporated by 15 U.S.C. § 8403)—, and Route does not obtain consumers' express informed consent before they

are charged for its service.

38. Legal scholars describe negative option arrangements in the same terms. "Fundamentally, negative option contracts are those that construe consumer silence as assent." Kaitlin Caruso & Prentiss Cox, *Silence as Consumer Consent: Global Regulation of Negative Option Contracts*, 73 Am. U. L. Rev. 1611, 1620 (2024) available at https://aulawreview.org/blog/silence-as-consumer-consent-global-regulation-of-negative-option-contracts/. Such arrangements "shift the seller's traditional responsibility to obtain consumer consent . . . to the consumer, who must now speak up if they don't consent." *Id.* at 1615.

39. When a seller builds its business on predictable consumer inattention, the practice is not innocent. "[W]hen companies are aware of these tendencies [indeed, study them at length] and take advantage of them in structuring their dealings with consumers, it appears appropriate to view the merchants' behavior as a deliberate attempt to inflate consumer transaction costs." *Id.* at 1627 (quoting Jeff Sovern, *Toward a New Model of Consumer Protection: The Problem of Inflated Transaction Costs*, 47 Wm. & Mary L. Rev. 1635, 1653, 1655 (2006)). "Negative option marketers effectively bet, with empirics on their side, that many consumers who do not wish to buy . . . the goods or services in question will fail" to act. *Id.* at 1632.

40. Negative option arrangements "can be used to create a business model that selects for, and depends on, inattentive and vulnerable consumers," because "[a] seller can profit even if their group of knowing, willing customers is almost nonexistent." *Id.* at 1633. Where "the consumer doesn't know . . . they subscribed to the service, the seller never incurs any cost to actually provide them with any services or benefits." *Id.* at 1634.

41. Consumer advocates likewise identify pre-selected options as a recognized form of manipulative design. "Dark patterns"—"sometimes also referred to as harmful or coercive choice

architecture"—are "design and choice architecture decisions deployed by hundreds of major companies that undermine individual choice and often impede the honest disclosure of information," and include "pre-selected options." Am. C.L. Union Found., Comment Letter on Advance Notice of Proposed Rulemaking—Negative Option Rule, RIN 3084-AB54, at 8–9 (Apr. 13, 2026), available at https://www.aclu.org/documents/aclu-comment-on-negative-option-rule-anprm-rin-3084-ab54.

42. As the ACLU explained to the FTC, "Consumer preferences can only be meaningfully ascertained by express or opt-in consent without pressure or manipulation." *Id.* at 2–3. Negative option practices "cause meaningful harm to consumers when companies make insufficient disclosures [and] charge customers without legitimate consent . . ." *Id.* at 2. "Consumers coerced, manipulated, or deceived into agreement and continuing 'consent' cannot therefore reasonably avoid the damage" that results. *Id.* at 4.

43. Route's negative option widget is deceptive and unfair for at least two reasons, as described further below.

**A. Because Reasonable Consumers Do Not Expect Merchants to Place Optional Items into their Shopping Carts, Reasonable Consumers Are Deceived When They Don't Notice Optional Items or Services are Added Without Their Affirmative Action.**

44. Reasonable consumers understand their shopping carts will remain empty until a consumer, seeing an item and a corresponding price listed on the website, affirmatively chooses to add an item or service to their shopping cart. In other words, reasonable consumers understand merchants will not put optional items or services into their shopping carts.

45. Because consumers do not expect optional services or items to be added without their affirmative action, many do not notice the addition of the optional service.

**B. Because Reasonable Consumers Do Not Expect Merchants to Slip Optional Items into their Shopping Carts, Reasonable Consumers Are Deceived Into Believing Optional Items are Mandatory When They are Added Without Consumers' Affirmative Action.**

46. As described above, reasonable consumers understand merchants will not put optional items or services into their shopping carts that they do not affirmatively select.

47. When Route's widget adds its optional shipping protection service to consumer shopping carts, as described above, even consumers who notice the additional service believe the service to be a mandatory and unavoidable addition.

48. Consumers are left entirely unaware that the added "Shipping Protection" or "Package Protection" charge is optional and must be removed by *figuring out a way to remove the service before proceeding to purchase.*

49. Thus, if consumers even notice a fee added to their transactions, consumers are still left unaware that the added "Shipping Protection" fee charge is optional, because it is presented in the cart as mandatory.

50. Independent of its affirmative misrepresentations, Route omits and conceals a single, uniform material fact in each one of its negative option transactions: that its fee is optional and can be removed. Route does not ask consumers whether they want to buy its product, and nowhere in the checkout flow does Route disclose that its fee, unlike the other charges in the cart, is not required.

51. Route has a duty to disclose that fact. First, Route has exclusive knowledge of it: Route designs the widget, sets the pre-selected default, and knows its fee is optional, while consumers have no reason to suspect that a third party has inserted an optional product into their order. Second, Route actively conceals the fact by designing the widget to add the fee automatically, at a late stage of checkout. Third, Route makes partial representations that are

misleading without disclosure: by placing its fee in the cart and order total alongside required charges, Route represents that the fee was part of what the consumer must pay, while suppressing the fact that it was not. Fourth, whether a charge is optional goes to the heart of the transaction—whether the consumer must pay it at all.

52. The omitted fact is material. Reasonable consumers care whether they are required to pay a charge, and Route itself knows that most consumers would decline its fee if they knew it was optional. Route's own figures show that when merchants ask consumers whether they want Route's product, roughly nine in ten decline.

53. Consumers would have learned the omitted fact had Route disclosed it. Route controls the one point that every consumer must pass through: the checkout page where its widget appears and where the consumer clicks to pay. The honest way to offer an optional product is to ask, with an unchecked box or a prompt that requires the consumer to choose. A consumer who sees that question learns that the product is optional. A consumer who never notices it never buys the product. Either way, the consumer does not pay for a product that the consumer did not choose. Route's own data confirm this point: when merchants ask, roughly nine in ten consumers decline. *See* ¶¶ 19-20.

54. Consumers cannot reasonably avoid this injury. A consumer cannot decline a charge he or she does not know is being imposed, and Route designed its widget's timing, placement, and default setting so that consumers would not notice the charge. Consumers have no reason to expect that a third party, unrelated to the retailer from which they are buying, will automatically add its own separate product to their order.

55. Route's practice provides no countervailing benefit to consumers or competition. Route could offer its product on an opt-in basis, permitting consumers who want it to select it. The

only benefit of the pre-checked default accrues to Route and its merchant partners, in the form of revenue from consumers who never chose to buy the product.

## III. Plaintiff Mertson's Experience

56. Plaintiff Mertson purchased chewable tablets from e-commerce retailer 7OHPLUS on January 17, 2026.

57. Plaintiff Mertson selected chewable tablets at their listed prices. He did not select Route's product. Upon information and belief, at the time of his purchase, 7OHPLUS used Route's default setting, under which Route's widget added Route's product to every order unless the consumer removed it.

58. However, his purchase included a $2.95 "Shipping Protection by Route" service that was automatically and surreptitiously added to his cart by Route's widget. On information and belief, the precise amount of the fee may have been slightly less because Plaintiff Mertson used a discount code that applied to all items in his cart.

59. Before he clicked to pay, Plaintiff Mertson viewed the checkout page, including his order summary and order total. He understood them to show the items he selected and the charges required to complete his purchase, such as shipping and tax, and he relied on that understanding when he paid. He did not notice, and nothing on the page told him, that Route's widget had added a separate, optional product to his order. Had Route asked whether he wanted its product, he would have declined.

60. Plaintiff Mertson reasonably believed that 7OHPLUS and its partners would not add optional services or items to his shopping cart without his affirmative action.

61. Plaintiff Mertson did not know 7OHPLUS and its partners had added an optional shipping protection service to his shopping cart.

## IV. Plaintiff Schirano's Experience

62. Plaintiff Schirano purchased peanut butter bars from e-commerce retailer Perfect Bar on September 24, 2024.

63. Plaintiff Schirano selected peanut butter bars at their listed prices. He did not select Route's product. Upon information and belief, at the time of his purchase, Perfect Bar used Route's default setting, under which Route's widget added Route's product to every order unless the consumer removed it.

64. Before he clicked to pay, Plaintiff Schirano viewed the checkout page, including his order summary and order total. He understood them to show the items he selected and the charges required to complete his purchase, such as shipping and tax, and he relied on that understanding when he paid. He did not notice, and nothing on the page told him, that Route's widget had added a separate, optional product to his order. Had Route asked whether he wanted its product, he would have declined.

65. However, his purchase included a "Route Package Protection" fee of $1.55 that was automatically and surreptitiously added to his cart by Route's widget.

66. Plaintiff Schirano reasonably believed that Perfect Bar and its partners would not add optional services or items to his shopping cart without his affirmative action.

67. Plaintiff Schirano did not know Perfect Bar and its partners had added an optional shipping protection service to his shopping cart.

## CLASS ALLEGATIONS

68. Plaintiffs bring this action on behalf of themselves and all other similarly situated persons. The proposed class (the "Class") is defined as:

> All persons in the United States who, within the applicable limitations period, paid for Route's shipping or package protection product after

Route's widget added that product to their order by default, without their affirmative selection.

69. Plaintiffs also bring this action on behalf of a New York Subclass consisting of all members of the Class whose order was shipped to a New York address (the "Subclass," and with the Class, the "Classes").

70. Excluded from the Classes are Route, any entities in which it has a controlling interest, any of its parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case, and their staff. Plaintiffs reserve the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based upon, *inter alia,* changing circumstances and/or new facts obtained during discovery.

71. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes and/or add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

72. The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because Route has acted on grounds generally applicable to the Classes. Such common legal or factual questions include, but are not limited to:

a. Whether Route's alleged conduct misled or had the tendency to mislead consumers;

b. Whether Route's widget added Route's product to consumers' orders by default;

c. Whether Route obtained consumers' affirmative consent before charging them;

d. Whether the fact that Route had added a separate, optional product to consumers' orders was material;

e. Whether Route engaged in unfair, unlawful, and/or fraudulent business practices under the laws asserted;

f. Whether Route's alleged conduct constitutes violations of the laws asserted;

g. Whether Plaintiffs and members of the Classes were harmed by Route's conduct;

h. Whether Route was unjustly enriched;

i. Whether Plaintiffs and the Classes have been damaged, and if so, the proper measure of damages; and

j. Whether an injunction is necessary to prevent Route from continuing to engage in the wrongful conduct described herein.

73. The parties are so numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Route's records. Route has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiffs.

74. It is impracticable to bring Class Members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary

duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

75. Plaintiffs' claims are typical of the claims of the other members of the Classes in that they arise out of the same wrongful business practices by Route, as described herein.

76. Plaintiffs are more than adequate representatives of the Classes in that Plaintiffs unintentionally paid for Route's services and have suffered damages as a result of Route's default-on practice and its concealment of the fact that the fee is not mandatory. In addition:

a) Plaintiffs are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and have retained competent counsel experienced in the prosecution of consumer class actions;

b) There is no conflict of interest between Plaintiffs and the unnamed members of the Classes;

c) Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

d) Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

77. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

78. Route has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate corresponding injunctive and declaratory relief with respect to the

Classes as a whole.

79. All conditions precedent to bringing this action have been satisfied and/or waived.

**FIRST CLAIM FOR RELIEF**
**Violation of New York General Business Law § 349**
**(On Behalf of Plaintiffs and the New York Subclass)**

80. Plaintiffs repeat and reallege the above factual allegations as if fully set forth herein.

81. This cause of action is asserted on behalf of Plaintiffs and members of the New York Subclass, whose members enjoy the protections of Article 22-A of the New York General Business Law, the Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 349 et seq., which prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349(a).

82. Route's policies and practices complained of herein were and are consumer-oriented, in that they affect all consumers who made online purchases through Route's widget.

83. Route's policies and practices complained of herein were and are misleading in a material respect because Route's deceptive acts were: (a) automatically adding its optional fee to consumers' carts and presenting it as a mandatory part of the purchase; and (b) concealing, suppressing, and omitting the material fact that its fee was optional and could be removed. Route had a duty to disclose that its service was optional for the reasons alleged above.

84. Route's presentation of its charge within the order summary and total was materially misleading because it represented that the charge was part of the amount consumers were required to pay, when the charge was optional.

85. Route's omission is independently actionable. Had Route adequately disclosed that its service was optional, Plaintiffs and members of the New York Subclass would have declined the service.

86. Plaintiffs and members of the New York Subclass were injured as a result of Route's policies and practices, in that they were charged Shipping Protection and Package Protection fees in a deceptive manner as described herein.

87. Route's actions were willful and knowing.

88. As redress for Route's repeated and ongoing violations of these consumer protection statutes, Plaintiffs and members of the New York Subclass each seek actual damages, treble damages, statutory damages, injunctive relief, and attorney's fees and costs.

## SECOND CLAIM FOR RELIEF
**False Advertising, N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiffs and the New York Subclass)**

89. Plaintiffs repeat and reallege the above factual allegations as if fully set forth herein.

90. N.Y. Gen. Bus. Law § 350 provides that "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

91. Through the widget interface Route designs and controls, Route disseminated misleading statements to New York consumers: it presented its service as a mandatory charge in consumers' carts and order summaries, and it presented order totals as the amount due when part of that amount was Route's optional service. These statements were misleading half-truths because Route omitted the material fact that its service was optional.

92. Route knew or should have known that its misrepresentations and omissions were false, deceptive, and misleading.

93. Route's omission is independently actionable. Had Route reasonably disclosed that its service was optional, Plaintiffs and members of the New York Subclass would have declined the service.

94. Plaintiffs and members of the New York Subclass have been injured by Route's violations of N.Y. Gen. Bus. Law § 350.

95. As an actual and proximate result of Route's misconduct, Plaintiffs and members of the New York Subclass were injured and suffered damages.

96. As redress for Route's repeated and ongoing violations of this consumer protection statute, Plaintiffs and the other members of the New York Subclass each seek actual damages, statutory damages, treble damages, injunctive relief, and attorney's fees and costs.

**<u>THIRD CLAIM FOR RELIEF</u>**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

97. Plaintiffs repeat and reallege the above factual allegations as if fully set forth herein.

98. To the detriment of Plaintiffs and the Classes, Route has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

99. Plaintiffs and the Classes conferred a benefit on Route.

100. Route unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Route to retain.

101. Route's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein. Route's enrichment resulted from its unfair practice of charging consumers through a default-on negative option without their affirmative consent, as alleged in above, independent of any deception.

102. Plaintiffs and the Classes, therefore, seek disgorgement of all wrongfully obtained fees received by Route as a result of its inequitable conduct as more fully stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes, demand a jury trial on all claims so triable and judgment as follows:

(a) Certification for this matter to proceed as a class action on behalf of the Class;

(b) For declaratory and injunctive relief as set forth above;

(c) For an order requiring Route to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth above;

(d) For compensatory damages according to proof;

(e) For reasonable attorneys' fees and costs of suit;

(f) For pre-judgment interest; and

(g) Awarding such other and further relief as this Court deems just, proper and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: October 28, 2026

**KALIELGOLD PLLC**

By: /s/*Jeffrey D. Kaliel*

Jeffrey D. Kaliel (Bar Roll No. 518372)
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
jkaliel@kalielpllc.com
Sophia G. Gold (Bar Roll No. 701241)
Amanda J. Rosenberg (Bar Roll No. 704394)
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783
sgold@kalielgold.com
arosenberg@kalielgold.com

*Attorneys for Plaintiffs and the Putative Classes*